Filed 11/14/14  In re J.B. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re J. B. et al., Persons Coming Under the Juvenile Court Law. | C075647 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>C. B. et al.,<br><br>Defendants and Appellants. | (Super. Ct. Nos. JD227271, JD233721, JD233722) |

The Sacramento County Juvenile Court declared seven-year-old J. B., six-year-old C. B., Jr., and four-year-old T. B. dependents of the court, removed the children from their parents' custody, and ordered reunification services.  This appeal is brought by C. B., the father of all three children (father), and by S. P., the mother of C. B., Jr., and

1

T. B. (mother). S. R., the mother of J. B., did not receive reunification services and is not a party to this appeal.

On appeal, mother and father (the parents) contend the evidence was insufficient to support the jurisdiction findings and the disposition orders.[1] We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On the night of August 26, 2013, or the early morning of August 27, 2013, mother fled from father through the bathroom window of the Reno, Nevada, motel room she and father were sharing and took refuge at the home of her cousin who lived nearby.

Mother feared for her safety and that of her children who had been left in Sacramento with father's foster brother Vincent Patteo. Mother sought assistance from her mother (maternal grandmother) who determined that the children and Patteo were staying with Patteo's mother who worked as a hairdresser in the area of Mack Road and Franklin Boulevard. The maternal grandmother and the maternal aunt located the children and Patteo hiding in some bushes behind the hair salon. The maternal grandmother gathered the children and departed. Soon thereafter, father telephoned the maternal grandmother and threatened to hurt her and the maternal aunt if they did not return the children. Later, while T. B. was being bathed, she disclosed that father had molested her. At that point, the maternal grandmother telephoned law enforcement and took T. B. to a hospital emergency room. When contacted by law enforcement, T. B. complained of pain in her vaginal area and indicated a possible sexual assault. The children were taken into protective custody and the matter was referred to the Sacramento County Department of Health and Human Services (Department).

T. B., who appeared to be a "very articulate and mature three year old," spoke to a social worker "extensively about the sexual abuse by the father and wanted to discuss

---

[1]     Father raised both issues in his opening brief. Mother filed an opening brief joining in the issues raised by father.

little else." The social worker found T. B.'s statement credible in that it included spontaneous statements and multiple details.

J. B. told his siblings to not speak to the social worker; then he told the social worker that the siblings "were lying" as to any information regarding T. B. being molested.

On August 29, 2013, petitions were filed alleging: (1) the children were left in the care of an "inappropriate individual," Patteo, who did not care for them and instead attempted to conceal them in some bushes in a parking lot; (2) mother has a long history of substance abuse from which she has failed to rehabilitate; (3) father has a long history of substance abuse from which he has failed to rehabilitate; (4) T. B. had been sexually abused; and (5) J. B.'s mother failed to reunify with J. B.'s half siblings in a prior dependency proceeding.

On August 27, 2013, while still at her cousin's home in Reno, mother spoke with a Department social worker. Mother said that father uses cocaine, crystal methamphetamine, ecstasy, and "mollies" (a powdered form of ecstasy consisting of one or more stimulants and hallucinogens). However, mother denied her own use of drugs.

Mother told the social worker that, while at the hotel in Reno, father arranged for some girls to "jump" her because he wanted her to do unspecified things that she did not want to do. Mother said that father is a member of the "blood" gang and that she is scared for her life. Father is abusive to mother and she was hiding out from him in order to avoid further physical assault.

When the social worker spoke to father that day, he denied threatening mother, denied that there was domestic violence between the two of them, and denied abuse or neglect of the children. Father admitted smoking marijuana but denied use of other drugs.

The next day, the social worker spoke to the maternal cousin whom the Department believed to be a credible collateral party to the investigation. The cousin

revealed that mother had lied to the social worker during their conversation of the previous day.

The maternal cousin told the social worker that early the previous day, she had located mother at a Reno hotel and had noticed that she was high on drugs and acting paranoid. Mother admitted to the cousin that she and father were using cocaine, crystal methamphetamine, ecstasy, and "mollies." Mother was hallucinating, i.e., talking to herself and hearing voices that were not real. The cousin knew from previous contacts with mother that she and father have a history of traveling to Reno where they earn money through pimping and prostitution. Prior to her escape, mother had panicked because she had "picked a white John" whom she began to believe was a police officer. Father tried to force her to have sex with the John, but her paranoia overcame her and she ran away.

The maternal cousin told the social worker that the children were being "groomed to be bloods." The cousin related mother's claims that T. B. can " 'roll a blunt' " (marijuana cigar) and that the parents allow their friends to serve beer to T. B. Mother admitted to the cousin that she uses drugs in the children's presence and tells them that she is "taking her medicine." Mother also claimed that she and father could "beat" drug tests by drinking water all day and then consuming beer, which would prevent the detection of drugs in their systems.

The maternal aunt told law enforcement that, while bathing T. B., she had indicated that she had pain in her vaginal area and that father had "whoop[ed] [whipped] her down there." T. B. indicated that father also had put his penis in her.

T. B. reported to law enforcement that father would get on top of her and put his penis in the area of her vagina. She reported 26 such incidents, primarily while the family resided in Atlanta, Georgia.

The maternal grandmother told the social worker that, in December 2012, the parents had traveled to Reno for three months and had left the children in her care. The

4

grandmother had reported the incident to the Department so she could obtain a caregiver's authorization affidavit so she could obtain medical care for the children.

The detective who investigated T. B.'s disclosure of sexual abuse told the Department that he believed the disclosure but did not know how he was going to prove it.

On August 28, 2013, father appeared at a drug and alcohol treatment facility and tested positive for marijuana and methamphetamine. He accepted the positive test for marijuana but disputed the result for methamphetamine. Father then relayed his test results to the social worker. He acknowledged his use of marijuana and claimed the methamphetamine result was a mistake.

Father told the social worker that he and mother had "worked out their issue" and that mother was residing with a female friend in Reno.

The Department attempted to place the children with the maternal grandmother and maternal aunt. However, neither of them qualified for placement because the grandmother had a Child Protective Services history and the aunt had some psychosocial issues. (Welf. & Inst. Code,[2] § 309.)

On September 3, 2013, the juvenile court ordered the children detained.

In a September 5, 2013, interview with the social worker, mother responded to the allegations in the petitions filed by the Department. Regarding the allegation of an inappropriate caretaker, mother reported that she and father have known Patteo for six years and that the children were located in the vicinity of Patteo's mother's hair salon. Patteo told mother that the children had been playing with other children in the bushes. Mother denied that Patteo had purposely hid the children from law enforcement.

---

[2]     Further undesignated statutory references are to the Welfare and Institutions Code.

5

Regarding the allegation of her substance abuse problem, mother said that she and father " 'don't do drugs' " but they " 'have friends [who] do.' "  Mother admitted that she and father smoke marijuana, but she did not believe that marijuana is a drug.  Mother denied that she had been under the influence of any illicit substances when she had appeared " 'actively high' " and had experienced paranoia and auditory hallucinations.

Regarding the allegation of father's substance abuse problem, mother denied knowledge of his use of substances other than marijuana.

Regarding the allegations of sexual abuse of T. B., mother claimed the maternal aunt had influenced the child to make statements related to father sexually abusing her.

Mother denied that her relationship with father involved domestic violence.  She claimed that, while in Reno, father had " 'gambled too much money' " and the couple " 'had words back and forth.' "  Mother admitted that father had slapped her one time but claimed it " 'wasn't even nothing.' "  She dismissed the slap, stating, " 'I believe sometimes with black women, we have a mouth on us and sometimes we need a good slap.' "  Mother maintained that, if father were threatening her, she would not be around him.  She said that she tells the children never to allow anyone to physically hurt them.

Mother told the social worker that the maternal grandmother's report of her having disclosed fear of father was " 'totally a lie.' "  Mother claimed the maternal grandmother " 'got it misunderstood,' " twisted mother's words, and lied about their conversations.

In a September 4, 2013, interview with the social worker, father stated that he and mother had agreed to leave the children with Patteo, his " 'foster brother.' "  Father acknowledged that Patteo allowed the children to play outside.  Father claimed that, while the children were at play, Patteo attempted to contact him regarding the maternal grandmother's "contacting law enforcement about the children."  Father's claim conflicted with the maternal grandmother's assertion that she contacted law enforcement *after* she had retrieved T. B. from Patteo and had heard T. B.'s disclosure of father's sexual abuse.

6

The social worker asked father about his history of leaving the children with inappropriate caretakers such as the maternal grandmother who has a child welfare history. Father denied leaving the children with the grandmother since he returned to Sacramento from Georgia, but he admitted that he planned to ask the grandmother to care for the children while he and mother found a new residence. Father acknowledged that a maternal uncle, Chris P., is a registered sexual offender and that he would have access to the children through the maternal grandmother.

In response to a question about his substance abuse, father denied that he and mother have substance abuse problems but admitted that he had friends who used narcotics. Father claimed he has a cannabis card, which allows him to purchase marijuana that helps to manage symptoms related to bipolar disorder, anger, and sleep deprivation. However, father did not bring the card to the interview. When asked about his August 28, 2013, positive drug test for methamphetamine and reports that he continues to use cocaine, methamphetamine, ecstasy, and "mollies," father denied the use of cocaine and "mollies" and claimed his friends had laced his marijuana with other drugs. Father claimed he " 'don't do no hardcore drugs,' " but he admitted that he smoked marijuana.

Father denied that there was any truth to the allegation of sexual abuse. He appeared agitated during the discussion of the topic. He denied that he had laid on top of T. B., digitally penetrated her, kissed her inappropriately, exposed his penis in front of her, or whipped her genitals.

Father denied that there was domestic violence in his relationship with mother and claimed that his "only" domestic violence incident involved the mother of J. B.

On September 9, 2013, the social worker interviewed J. B. at his foster placement. J. B. explained the reason for the detention as follows: " '[Patteo] went to his mom's work and we went to the back and we hid in the bushes. [Patteo] took us to the bushes

7

because the police were coming,' and indicated law enforcement was attempting to locate [Patteo]."

On September 11, 2013, a social worker conducted a "SAFE" interview of T. B. regarding the alleged sexual abuse. When asked if anyone had ever touched or hurt her, T. B. said, "No." When asked if there were places on her body that no one should touch, T. B. again said, "No." T. B. added, " 'Nobody didn't touch me, but *I talked together with my brothers.*' " (Italics added.)

In a September 23, 2013, alcohol and drug assessment, mother denied the use of anything but marijuana and alcohol notwithstanding the detention report's description of her using other substances. Mother was referred for random drug testing and supportive services.

Father reported that he had used marijuana from age 10 to the present and that he smokes three marijuana "blunts" per day. He denied that he used methamphetamine, cocaine, other illicit drugs, or alcohol.

The Department acknowledged that it had not developed sufficient evidence of sexual abuse, in that law enforcement indicated there was insufficient evidence to assign a detective to the case; the examining physicians had observed nothing indicative of sexual assault; and during her "SAFE" interview, T. B. denied that she had been abused. The Department asked the court to dismiss the sexual abuse allegations.

Amended petitions were filed shortly before the jurisdiction and disposition hearing in December 2013. The amended petitions for all three children alleged that they had been left in the care of Patteo, an inappropriate caretaker, who did not care for the children adequately and instead tried to conceal them in bushes behind a hair salon. In addition, the parents have a history of leaving the children with inappropriate caretakers including the maternal aunt, uncle, and grandmother.

The amended petitions for all three children alleged that father has a long history of substance abuse from which he has failed and/or refused to rehabilitate and that

8

impairs his judgment and ability to care for the children. Father started using marijuana at age 10, uses marijuana daily, has used it in the presence of the children, and has tested positive for marijuana on several dates. On August 27, 2013, father also used cocaine, methamphetamine, ecstasy, and "mollies."

The amended petitions for C. B., Jr., and T. B. alleged that mother has a substance abuse problem from which she has failed and/or refused to rehabilitate and that impairs her judgment and ability to care for the children. Mother regularly uses marijuana in the children's presence. On August 27, 2013, mother used cocaine, methamphetamine, ecstasy, and "mollies." She was observed to be actively high and demonstrating paranoia and auditory hallucinations.

The amended petition for J. B. alleged that his mother has a substance abuse problem and that his mother's parental rights to his half siblings had been terminated.

JURISDICTION AND DISPOSITION HEARING

The parents were present at the December 19, 2013, jurisdiction and disposition hearing, but they did not offer any evidence or testimony. J. B.'s mother was not present. Counsel for the parties presented argument based on the various reports submitted by the Department.

The Department's argument relied on mother's statements to the maternal grandmother, to law enforcement, and to a Department social worker before mother returned to Sacramento and allegedly "reconciled" with father. The Department relied on both parents' substance abuse, father's domestic violence, mother's fear of father, mother's recantation after she "reconciled" with father whom she is afraid of, and the corroborating statements of the maternal grandmother and maternal cousin. The Department's counsel also summarized the evidence regarding the parents' history of leaving the children with inappropriate caretakers for extended periods without making adequate arrangements for the children. Counsel for the children agreed with the Department's assessment.

9

The juvenile court declined to find that Patteo was an inappropriate caretaker, but it accepted the Department's allegation that he did not provide adequate care for the children. The court credited the report's allegation that Patteo was attempting to "conceal" the children "from law enforcement," which was coming specifically to find Patteo. Agreeing with the arguments made by counsel for the Department and the children, the juvenile court sustained the petitions for all the children.

DISCUSSION

I

*Substantial Evidence Supports The Jurisdiction Findings*

The parents contend the juvenile court's finding that the children had suffered, or were at substantial risk of suffering, serious physical harm or illness as a result of any failure on the part of the parents is not supported by any substantial evidence. Specifically, the parents dispute the court's findings with respect to substance abuse and Patteo's failure to provide adequate care for the children. We consider these points in turn.

A

*Standard Of Review*

When the sufficiency of the evidence to support a finding or order is challenged on appeal, even where the standard of proof in the trial court is clear and convincing, the reviewing court must determine if there is any substantial evidence -- that is, evidence which is reasonable, credible and of solid value -- to support the conclusion of the trier of fact. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924; *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.) In making this determination we recognize that all conflicts are to be resolved in favor of the prevailing party and that issues of fact and credibility are questions for the trier of fact. (*In re Jason L.*, at p. 1214; *In re Steve W.* (1990) 217 Cal.App.3d 10, 16.) The reviewing court may not reweigh the evidence when

10

assessing the sufficiency of the evidence. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

Moreover, when the arguments by petitioner " 'only tend to establish a factual context which, *had it been credited by the trial court*, might have led to a different decision,' " such arguments are facially meritless in light of the standard of review in this court. (*In re Charmice G.* (1998) 66 Cal.App.4th 659, 664, italics added.)

We need find only one ground is supported by substantial evidence to affirm the juvenile court's exercise of jurisdiction. (See *In re Tracy Z.* (1987) 195 Cal.App.3d 107, 112-113.)

B

*Mother's Substance Abuse*

Mother spoke with a Department social worker while at her cousin's house in Reno. Mother said that father uses cocaine, crystal methamphetamine, ecstasy, and "mollies." However, mother denied her own use of drugs.

The maternal cousin told the social worker that early the previous day she had located mother at a Reno motel and had noticed that she was high on drugs and acting paranoid. Mother admitted to the cousin that she and father were using cocaine, crystal methamphetamine, ecstasy, and "mollies." Mother was hallucinating, i.e., talking to herself and hearing voices that were not real.

The maternal cousin reported that mother had claimed that she and father could "beat" drug tests by drinking water all day and then consuming beer, which would prevent the detection of drugs in their systems. The social worker found the maternal cousin to be credible.

After mother returned from Reno, she denied that she or father used illicit drugs other than marijuana, which she does not consider a drug. Mother denied that she had been under the influence of any illicit substances when she had appeared " 'actively

11

high' " and had experienced paranoia and auditory hallucinations. Mother denied knowledge of father's use of substances other than marijuana.

The juvenile court could infer that, after reconciling with father, mother recanted her earlier admission of drug use. The court could find that the recantation was not credible and that the earlier admission to the cousin, a reliable third party, was credible.

C

*Father's Substance Abuse*

Father began using marijuana at age 10. In September 2008, during a prior dependency case involving J. B., father initially denied marijuana use, tested positive for marijuana, made excuses for testing positive for marijuana, and stated his intention to obtain a medical marijuana card. Father tested positive for cocaine and marijuana in October 2008. Father also tested positive for cocaine in February 2010. Father denied using cocaine and made excuses for the positive cocaine test.

Father tested positive for methamphetamine and marijuana shortly after the maternal cousin's report that mother and father were using drugs. Father made excuses for the positive methamphetamine test, as he earlier had done regarding cocaine during the first dependency case. Father claimed he used marijuana to help him stay calm when not on his prescribed medication. Father claimed his marijuana use was pursuant to a medical marijuana card, but he failed to produce such a card for the Department.

The juvenile court could find father's claims of false positive tests for methamphetamine and authorized marijuana use were not credible. The court could credit mother's statements to the maternal cousin describing father's drug use and could discredit mother's subsequent recantation. Father's suggestion that the court could find the recantation more credible than the initial claim is meritless in light of our standard of review. (*In re Charmice G.*, *supra*, 66 Cal.App.4th at p. 664.)

12

D

*Nexus To The Children*

The juvenile court could infer a sufficient nexus between the parents' drug use and the children's safety. The maternal cousin related mother's claims that T. B. can " 'roll a blunt' " (marijuana cigar) and that the parents allow their friends to serve beer to T. B. Mother admitted to the cousin that she uses drugs in the children's presence and tells them that she is "taking her medicine." Mother did not deny that the drugs in question included marijuana. The parents' claims that the "children knew nothing of any drug use" and that there was "no evidence" that mother "regularly used marijuana in the presence of the children" have no merit. The record supports the finding that the parents' drug use subjects the children to substantial risk of harm.

The evidence that the parents failed to conceal their drug use from the children distinguishes this case from *In re Drake M*. (2012) 211 Cal.App.4th 754 (questioned on another point in *In re Christopher R*. (2014) 225 Cal.App.4th 1210, 1218), in which there was no evidence the child was exposed to marijuana, drug paraphernalia, or even secondhand smoke. (*In re Drake M.*, at pp. 768-769.) The present jurisdictional findings are based on far more than father's allegedly lawful use of medical marijuana.

The evidence that the parents taught T. B. how to roll a marijuana cigar and have allowed their friends to serve T. B. beer distinguishes the present case from *In re Destiny S*. (2012) 210 Cal.App.4th 999 in which the child had never seen the mother's drug use and at most had smelled it and indicated," 'it's not very much.' " (*Id*. at p. 1004.) The juvenile court could perceive that the parents were grooming the children to be drug abusers and that such grooming exposed them to substantial risk of harm.

13

# E

## *Unsafe Caretakers*

The maternal cousin reported that the parents have a history of traveling to Reno where father prostitutes mother to make money. Prior to their most recent Reno trip, the parents left the children with Patteo.

J. B. told the social worker " '[Patteo] went to his mom's work and we went to the back and we hid in the bushes. [Patteo] took us to the bushes because the police were coming,' and indicated law enforcement was *attempting to locate* [*Patteo*]." (Italics added.)

The juvenile court credited this passage, stating: "The report does clearly lay out that [Mr. Patteo] was attempting to conceal [the children] in the bushes behind the hair salon and *conceal them* from law enforcement when [J. B.] believed was coming specifically to find Mr. Patteo." (Italics added.) The parents do not dispute that J. B.'s testimony is sufficient for proof of the facts asserted. (Evid. Code, § 312; *In re Andrew I.* (1991) 230 Cal.App.3d 572, 578.) The juvenile court was not required to draw the inference, suggested by the parents, that Patteo was attempting to conceal the children, not from law enforcement, but from persons (i.e., maternal relatives) with whom father did not want the children placed.

The record does not support the Department's claim that Patteo "hid the children in the bushes to conceal them from law enforcement *looking for the children*." (Italics added.) J. B. had indicated that law enforcement was looking *for Patteo*, not the children. According to the maternal grandmother, law enforcement was called *after* the children were recovered and T. B. disclosed sexual abuse.

The juvenile court properly understood the report as reflecting a police search *for Patteo*.[3] The court could infer that, because Patteo and the children were together, Patteo could conceal himself most successfully if he also concealed the three small children. Contrary to the parents' argument, the court could infer that the children's well-being would be adversely affected by Patteo's entangling them in his attempt to evade law enforcement.

During a previous Reno trip, the parents had left the children with the maternal grandmother for three months. The grandmother had a Child Protective Services history and a maternal uncle, Chris P., was a registered sexual offender who would have access to the children through the maternal grandmother. The juvenile court could find that the maternal grandmother was an inappropriate caretaker for the children. The jurisdictional findings are supported by substantial evidence.

## II

### *Substantial Evidence Supports The Disposition Orders*

The parents contend the evidence does not support the disposition order removing the children from their physical custody. The parents claim the court "set out no facts for its conclusion that removal was the only means to protect the children," and returning the children to the parents under strict supervision would have been a reasonable alternative. We disagree.

## A

### *Relevant Legal Principles*

To support an order removing a child from parental custody, the juvenile court must find clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if

---

[3] The nature of the police interest in Patteo was not established in the juvenile proceedings.

15

the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the parent's . . . physical custody." (§ 361, subd. (c)(1).)  The juvenile court must also "make a determination as to whether reasonable efforts were made to prevent or eliminate the need for removal of the minor" and "state the facts on which the decision to remove the minor is based." (*Id.*, subd. (d).)

" 'The jurisdictional findings are prima facie evidence that the child cannot safely remain in the home.  [Citation.]' [Citation.]  ' "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child." [Citation.]  The court may consider a parent's past conduct as well as present circumstances.  [Citation.]' [Citation.]  We review a dispositional order removing a child from parental custody for substantial evidence." (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.)

B

*Necessity For Removal*

The parents contend that, after sustaining the amended petitions, the juvenile court "set out no further facts or findings to conclude by 'clear and convincing evidence' that a return home would present a substantial danger to the minors and that there are no reasonable means, absent removal, to protect the children."  But the court had no duty to present "further facts," since the " 'jurisdictional findings are prima facie evidence that the child cannot safely remain in the home.' " (*In re John M.*, *supra*, 212 Cal.App.4th at p. 1126.)  The court adopted the findings proposed in the Department's jurisdiction/disposition report, under the standard of clear and convincing evidence.

The parents appear to contend the juvenile court abused its discretion when it ordered as part of father's case plan that he obtain "verification from a doctor that the use of medical marijuana is appropriately indicated to treat mental health issues," and that he

16

undergo a "mental health assessment" as to whether treatment of those issues is "a legitimate use of medical marijuana."

Reprising their previous argument, the parents claim their mere use of marijuana or other drugs is "not the concern of the juvenile court." (Citing *In re Drake M.*, *supra*, 211 Cal.App.4th 754; *In re Destiny S.*, *supra*, 210 Cal.App.4th 999.) But here, the court's evident concern was to confine the parents' marijuana use to the treatment of appropriate issues and thus to minimize the children's ongoing exposure to -- and grooming for -- abuse of illicit drugs. No error or abuse of discretion is shown.

C

*Alternatives To Removal*

The parents contend a reasonable alternative to removal would have been to order custody returned to the parents under the Department's strict supervision, which could have included monitoring the parents' progress in court-ordered reunification services to "be certain that any drug usage was not affecting the care and safety of the minors." We disagree.

The juvenile court found by clear and convincing evidence that there were no reasonable means by which the children's physical health can be protected without removing them from the parents' physical custody. (§ 361, subd. (c)(1).) The record supports the court's finding.

In the three months from detention to disposition, the parents had made minimal progress in addressing their issues. Father had tried to obtain a mental health appointment, but he had not started services such as medication monitoring, counseling, substance abuse treatment, and parenting education. Although the parents now identify strict monitoring of court-ordered services as a reasonable alternative, father's failure to start any such services prior to the disposition hearing meant that the juvenile court could only speculate as to whether father would, in fact, obtain and complete the requisite

17

services.  The parents have not shown that the removal order was an abuse of the court's discretion.

## DISPOSITION

The judgment is affirmed.


      ROBIE      , Acting P. J.


We concur:


      BUTZ      , J.


      MURRAY      , J.